16-977-cv, 16-3549-cv
*In re: DeRogatis*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2017

(Argued: November 1, 2017    Decided: September 14, 2018)

Docket Nos. 16-977-cv, 16-3549-cv

IN RE: EMILY DEROGATIS[*]

Docket No. 16-977-cv

EMILY DEROGATIS,

*Plaintiff–Counter-Defendant–Appellant*,

—v.—

BOARD OF TRUSTEES OF THE WELFARE FUND OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 15, 15A, 15C & 15D, AFLCIO; TRUSTEE JAMES T. CALLAHAN; TRUSTEE THOMAS A. CALLAHAN; TRUSTEE FRANCIS DIMENNA; TRUSTEE JOHN BRUNETTI,

*Defendants–Counter-Claimants–Appellees*.

Docket No. 16-3549-cv

EMILY DEROGATIS,

*Plaintiff–Consolidated-Counter-Defendant–Appellant*,

[*] The Clerk of Court is directed to amend the captions as set forth above.

—v.—

BOARD OF TRUSTEES OF THE CENTRAL PENSION FUND OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS AND PARTICIPATING EMPLOYERS, PLAN ADMINISTRATOR; MICHAEL R. MURPHY, TRUSTEE; TERRENCE E. MCGOWAN, TRUSTEE; BRIAN E. HICKEY, TRUSTEE; JOHN DUFFY, TRUSTEE; ROBERT P. MCCORMICK; NOEL C. BORCK, TRUSTEE; PAUL O. GEHL, TRUSTEE; J. PATRICK TIELBORG, TRUSTEE; PAUL C. BENSI, TRUSTEE,

*Defendants–Appellees,*

JAMES T. CALLAHAN, TRUSTEE,

*Defendant–Consolidated Defendant–*
*Consolidated-Counter-Claimant–*
*Appellee,*

TRUSTEE FRANCIS DIMENNA; JOHN BRUNETTI; TRUSTEE THOMAS A. CALLAHAN; BOARD OF TRUSTEES OF THE WELFARE FUND OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 15, 15A,15C &15D, AFL-CIO,

*Consolidated-Defendants–*
*Consolidated-Counter-Claimants.*

———————

Before:

LYNCH, CARNEY, *Circuit Judges*, and VITALIANO, *District Judge*.[†]

———————

In these tandem cases, plaintiff-appellant Emily DeRogatis appeals the judgment of the District Court (McMahon, *C.J.*) awarding summary judgment to defendants-appellees, the trustees of two union-affiliated employee benefit plans, on her claims for relief asserted under the Employee Retirement Income Security Act ("ERISA"), 29

———————

[†] Judge Eric N. Vitaliano, of the United States District Court for the Eastern District of New York, sitting by designation.

U.S.C. §§ 1001 *et seq*. The benefit plans at issue are the Pension Plan, which governed benefits payable to Emily as a surviving spouse after the death of her husband, Frank, and the Welfare Plan, which governed the DeRogatises' entitlement to health benefits during and after Frank's lifetime. The conflict arises primarily because of certain oral miscommunications by Plan personnel to the DeRogatises before Frank's death in 2011.

*As to No. 16-3549-cv*: On de novo review, we conclude that the Pension Fund trustees correctly denied DeRogatis's request for an augmented survivor benefit following her husband's death. We therefore affirm the District Court's decision denying DeRogatis's claim under ERISA § 502(a)(1)(B) against the Pension Fund for benefits due. As to DeRogatis's claim under ERISA § 502(a)(3) for breach of fiduciary duty, the District Court reasoned that a plan administrator cannot be held liable for unintentional misrepresentations made about the plan's operation by its non-fiduciary, "ministerial" agent and on this basis denied the claim. We reject that ruling. Nonetheless, we affirm the judgment denying DeRogatis relief under this section because the Pension Plan's summary plan description ("SPD") adequately described the eligibility requirements for the benefits in question and thereby satisfied the trustees' fiduciary duty to provide complete and accurate information to plan participants and beneficiaries. In No. 16-3549-cv, the summary judgment entered for the Pension Fund defendants is therefore AFFIRMED.

*As to No. 16-977-cv*: DeRogatis asserts an ERISA § 502(a)(3) claim for breach of fiduciary duty against the trustees of the Welfare Fund. The District Court granted summary judgment for defendants on this claim on the same "ministerial employee" ground as described above. We again reject that analysis. We disagree, too, with the District Court's conclusion that the Welfare Plan SPD explained clearly its participants' options to receive post-retirement health benefits. Given the evidence that Welfare Fund agents misstated material aspects of those same benefits when communicating with the DeRogatises, we identify an open question of material fact concerning whether the Welfare Fund trustees breached their fiduciary duty to provide plan participants with complete and accurate information about their benefits. We therefore vacate the judgment entered in favor of the Welfare Fund defendants. On remand, the Welfare Fund defendants may yet be entitled to summary judgment if they demonstrate that DeRogatis is not entitled to any equitable relief, thereby negating the final element of DeRogatis's § 502(a)(3) claim. Accordingly, in No. 16-977-cv, the judgment for the Welfare Fund defendants is VACATED and the cause is REMANDED for further proceedings consistent with this opinion.

———————

ROBERT L. LIEBROSS, Law Office of Robert L. Liebross, New York, NY (Edgar Pauk, Law Office of Edgar Pauk, Brooklyn, NY, *on the brief*), *for Emily DeRogatis.*

JAMES M. STEINBERG (Joseph H. Green, *on the brief*), Brady McGuire & Steinberg P.C., Tarrytown, NY *for Defendants–Counter-Claimants–Appellees in Docket No. 16-977.*

LISA M. GOMEZ (David R. Hock, Michael S. Adler, *on the brief*), Cohen, Weiss and Simon LLP, New York, NY, *for Defendants-Appellees and James T. Callahan, Trustee, in Docket No. 16-3549.*

SUSAN L. CARNEY, *Circuit Judge*:

Plaintiff Emily DeRogatis's husband, Frank DeRogatis, a long-time operator of heavy machinery on construction sites and a member of the International Union of Operating Engineers "Local 15" in New York City, succumbed to lung cancer in September 2011 at the age of 61. These tandem cases, in which his widow Emily asserts claims for relief under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq*., against multiemployer benefit plans, arise from events that occurred in the months preceding Frank's untimely death, when the couple was endeavoring to secure Emily's financial future.

Frank was a participant in two multiemployer benefit plans affiliated with Local 15: a Pension Plan, which provided pension and survivor benefits, and a Welfare Plan, which provided health benefits. When he died, Emily became entitled to a monthly survivor benefit through the Pension Plan.[1] The monthly payments that she

---

[1] When describing events occurring while Frank was still alive, we refer to Emily and Frank DeRogatis by their first names. With regard to later events, we use either "DeRogatis" or "Emily" to refer to Emily as a claimant and litigant.

4

received were several hundred dollars lower than the amount she had expected, however. She sought to obtain the difference in suits against the administrators of each Plan filed in the United States District Court for the Southern District of New York. Both suits hinge on the effect to be afforded certain potentially misleading representations that were made to the DeRogatises before Frank's death about how and when they should apply for the desired benefits.

The first suit, filed in 2013 and which on appeal is No. 16-3549, focuses on the Pension Plan. In it, Emily named as defendants the Plan's administrators: the board and several individual trustees of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers (collectively, the "Pension Fund").[2] She asserted two claims against the Pension Fund: first, a claim for benefits due under ERISA section 502(a)(1)(B), in which she argued that the clear terms of the Pension Plan entitled her to the augmented survivor benefit; and second, a claim for breach of fiduciary duty under ERISA section 502(a)(3), based on her contention that Frank missed his opportunity to apply for the augmented benefit because of misrepresentations made by the Fund's agents.[3]

---

[2] The Pension Fund defendants comprise the parties styled in the caption for Docket No. 16-3549 as defendants-appellees. The Pension Fund is a trust fund, which cannot itself be sued under the ERISA rights of action that DeRogatis here asserts. The defendants named in Emily's lawsuit are the Pension Fund's trustees, who make payments from the Fund pursuant to the terms of the Pension Plan and any applicable collective bargaining agreements. *See* 29 U.S.C. § 186(c)(5) (defining the processes for establishing and managing funds for multiemployer benefit plans). In this opinion, we use the "the Pension Fund" to refer collectively to the Fund's board and trustees, who are suable under ERISA in their capacity as administrators of the Pension Plan (as explained further in Discussion Section III, below).

[3] As do the parties, we generally refer to the relevant statutes by their ERISA section numbers rather than by their sections as codified in title 29 of the United States Code. For the reader's

5

In the tandem suit, filed in 2014 and which on appeal is No. 16-977, Emily sued the Welfare Plan's administrators: the board and several individual trustees of the Welfare Fund of the International Union of Operating Engineers Local 15, 15A, 15C & 15D, AFL-CIO (collectively, the "Welfare Fund").[4] She brought an ERISA claim for breach of fiduciary duty under section 502(a)(3), but the relief she sought did not pertain to health benefits under the Welfare Plan. Rather, she argues that misrepresentations by Welfare Fund agents about Welfare Plan benefits caused Frank to delay applying for retirement, thereby sacrificing an augmented survivor benefit under the *Pension* Plan. Emily thus seeks to hold the Welfare Fund liable for the decrease in Emily's Pension Fund survivor benefits.

The District Court (McMahon, *Chief Judge*) granted summary judgment to both sets of defendants on all claims.

With respect to Emily's section 502(a)(1)(B) claim against the Pension Fund for benefits due, we conclude, on de novo review, that the Pension Fund was entitled to

reference, we provide here a list of the ERISA sections cited in this opinion, along with their corresponding Code citations and statutory titles:

- ERISA § 3, 29 U.S.C. § 1002 (Definitions);
- ERISA § 102, 29 U.S.C. § 1022 (Summary plan description);
- ERISA § 205, 29 U.S.C. § 1055 (Requirement of joint and survivor annuity and preretirement survivor annuity);
- ERISA § 404, 29 U.S.C. § 1104 (Fiduciary duties); and
- ERISA § 502, 29 U.S.C. § 1132 (Civil enforcement).

[4] The Welfare Fund defendants comprise the parties styled in the caption for Docket No. 16-977 as defendants–counter-claimants–appellees. The "counter-claimants" designation reflects that in the early stages of the litigation, the Welfare Fund asserted a counterclaim against DeRogatis. The parties eventually stipulated that the Welfare Fund would withdraw the counterclaim with prejudice, and it is not at issue on appeal. We use "the Welfare Fund" to refer collectively to the Welfare Fund board and trustees.

summary judgment. The plain terms of the Pension Plan establish that Emily was not entitled to the augmented survivor benefit that she seeks, notwithstanding any erroneous advice that she may have received. We therefore affirm the District Court's decision in No. 16-3549 on Emily's section 502(a)(1)(B) claim.

As for her claims in both suits for breach of fiduciary duty under ERISA section 502(a)(3), the District Court granted summary judgment to each Fund on the grounds that ERISA fiduciaries such as the defendant trustees cannot be held liable for misrepresentations made to plan participants by non-fiduciary, "ministerial" employees. We disagree with the District Court in this regard. We have long interpreted ERISA to require that Plan fiduciaries provide "complete and accurate" information to plan members and beneficiaries about their benefits. *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 10 (2d Cir. 1997). We have in the past permitted plaintiffs to pursue claims for breach of that fiduciary duty that are based on a combination of unclear written plan materials and misrepresentations made by plan agents who were not themselves fiduciaries. *See id.* That approach governs Emily's claims here.

Notwithstanding that disagreement, however, we find that the Pension Plan's summary plan description ("SPD") clearly communicated the eligibility requirements for the various pension and survivor benefits available under that plan, thereby satisfying the Pension Fund's fiduciary duty to provide complete and accurate information. For that reason, the misrepresentations made by Plan agents do not establish a breach of that Fund's fiduciary duty, and we accordingly affirm the District Court's award of summary judgment in favor of the Pension Fund on Emily's section 502(a)(3) claim in No. 16-3549.

As to the Welfare Fund, however, we rule that the SPD provided by those trustees fell short of providing the requisite clear explanation of participants' options to

7

receive post-retirement health benefits. Further, the record contains evidence suggesting that Welfare Fund agents misstated the Plan's health benefits when communicating with the DeRogatises before Frank's death. When we consider together the SPD and the statements by Welfare Fund agents, we identify an open question of material fact concerning whether the Welfare Fund trustees breached their fiduciary duty to provide the DeRogatises with complete and accurate information about their benefits under the Plan. In No. 16-977, therefore, we vacate the judgment entered in the Welfare Fund's favor, and we remand the cause to the District Court for further proceedings consistent with this opinion.

In sum, and for reasons set forth further below, we AFFIRM the District Court's judgment in favor of the Pension Fund on all claims asserted in No. 16-3549; and we VACATE the judgment entered in favor of the Welfare Fund in No. 16-977 on DeRogatis's section 502(a)(3) claim for breach of fiduciary duty and REMAND that cause to the District Court for further proceedings consistent with this opinion.

## BACKGROUND

The facts as stated in this section are drawn from the extensive summary judgment record. Although the parties agree on the basic timeline of relevant events, they dispute many of the finer details, as noted in the sections that follow. Because the appeals challenge orders granting summary judgment to defendants, we present here the version of the facts most favorable to DeRogatis's claims, and we draw all reasonable inferences in her favor. *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017).

8

## I.     The Pension Plan and the Welfare Plan

Frank DeRogatis, the late husband of Emily DeRogatis, worked as an operating engineer until shortly before his death in September 2011. As a member of Local 15 of the International Union of Operating Engineers in New York City, Frank was eligible to participate in union-affiliated multiemployer employee benefit plans. These included the Pension Plan, which provides pension and survivor benefits to participants and their families, and the Welfare Plan, which provides health benefits.[5]

### A.     Pension and survivor benefits available under the Pension Plan

Under the Pension Plan, participants can choose among various options as to both the timing of their retirements and the structure of their pension and survivor benefits. The following summary of those benefits is drawn from the summary plan description that the Pension Fund distributed to Plan members.[6] (As described below in Discussion Section II.B, the parties dispute the precise mechanisms by which members may qualify for certain benefits, and also whether the SPD accurately reflects the binding terms of the Pension Plan.)

#### 1. Pension benefits

As Pension Plan members accumulate years of qualifying work experience, they become eligible under the Plan for different forms of retirement: "early" (at age 55),

---

[5] For definitions of these statutory terms of art, see ERISA §§ 3(1) (welfare plans), 3(2)(A) (pension plans), 3(37)(A) (multiemployer plans).

[6] The Pension Fund amended the Pension Plan SPD on August 1, 2011, shortly before Frank died. No party has alerted the Court to any material differences between the two versions of the SPD that were in effect during the time period at issue in these appeals. In this opinion, we cite to the August 1, 2011 version of the Pension Plan SPD, and we speak in the present tense as to what the Pension and Welfare Plans offer and the SPDs state, without regard to any subsequent changes, as these are not reflected in the record.

9

"special" (at age 62), and "normal" (at age 65). Each form of retirement is linked to different types of pension and survivor benefits. In the months preceding Frank's death at age 61, he was eligible for "early" retirement, but not yet for "special" or "normal" retirement. A Pension Plan member who wishes to retire must select among the various forms of pension benefits that are available to him (or her) under the Plan. The Pension Fund will not begin to pay pension benefits until the retiree has selected a benefit type, and, once the selection is made, it cannot be changed.

The Plan provides that, for all three retirement statuses (early, special, and normal), the "normal form of benefit" for a *married* retiree is the qualified joint and survivor annuity (the "Joint Annuity" pension). Pension App'x 1805.[7] With a Joint Annuity pension, the retiree accepts a lower monthly benefit payment during his lifetime in exchange for the right to designate his spouse as an additional beneficiary; after the retiree dies, the spouse is entitled to receive a portion of the annuity payment for his or her lifetime.[8]

A retiree who selects the Joint Annuity pension must, at the time of benefit election, designate a spousal benefit percentage of between 50 and 100%. The higher the spousal benefit percentage after the retiree's death, the lower the monthly benefit amount will be during the retiree's lifetime.

---

[7] Record citations to the "Pension App'x" refer to the joint appendix filed in No. 16-3549. Citations to the "Welfare App'x" refer to the joint appendix filed in No. 16-977.

[8] The Plan also allows retirees, including married retirees, to choose a benefit structure that does not include a spousal entitlement. If a retired Plan member selects the Joint Annuity benefit but outlives his spouse, then the Pension Fund will increase the member's monthly benefit payment after the spouse's death to the amount he would have received under the "single life annuity" benefit.

### 2. *Survivor benefits*

The Joint Annuity pension features a survivor benefit, as described above: if a retiree receiving a Joint Annuity pension dies, the retiree's spouse will receive the designated spousal entitlement until the spouse's own death. If a Pension Plan member was not already receiving a pension benefit at the time of his death, however, the amount and duration of the payable death and survivor benefits will depend on several factors. For a member in Frank's position—someone who, at the time of death, was both married and eligible for "early" retirement—the member's spouse is entitled to a qualified preretirement survivor annuity (the "Preretirement Annuity") equivalent to 50% of the member's accrued retirement benefit. This "50%" Preretirement Annuity is not necessarily equivalent to the survivor payment under a "50%" Joint Annuity, however.[9] In this instance, the Fund calculated Emily's monthly Preretirement Annuity payment as $787, an amount midway between the estimated survivor benefit payments she would have received under a 50% Joint Annuity (approximately $590) and a 100% Joint Annuity (approximately $1,080).

### B.     Health benefits available under the Welfare Plan

The Welfare Plan provides Local 15 members with coverage for their healthcare costs. Unlike many employer-sponsored health plans, the Welfare Plan does not designate an annual enrollment period during which eligible employees may sign up to

---

[9] For this reason, we find potentially misleading the parties' references to a "50% Preretirement Annuity" benefit. As a matter of law, the payments under a Preretirement Annuity can be *no smaller* than the payments a surviving spouse would have received under the Plan's 50% Joint Annuity. *See* ERISA § 205(e)(1). The Preretirement Annuity payments can be larger, however, as turned out to be the case for Emily. To minimize confusion, in this opinion we refer simply to the "Preretirement Annuity" survivor benefit, as contrasted with the Joint Annuity pension and survivor benefit that is available at multiple spousal benefit percentage levels.

receive benefits. Rather, Plan members intermittently accrue coverage for the future based on the number of hours they have worked.

Thus, every four months, members submit their employment records for the preceding four-month coverage-accrual period. The Welfare Fund tallies each member's hours of qualifying labor, then credits the member with up to twelve months of future healthcare coverage. Early retirement does not affect an entitlement to future healthcare coverage that has already accrued in this way. Thus, if a member earns twelve months of future coverage and then elects to take early retirement four months after coverage has begun, the member remains entitled to the remaining eight months of coverage under the Welfare Plan.[10]

### C.    The relationship between the Welfare Fund and the Pension Fund

The Welfare Fund maintains an office in New York City to serve Local 15's members. The Pension Fund, in contrast, operates from its headquarters in Washington, D.C., and has no office in New York City. The two Plans have no direct formal affiliation with each other, but employees at the Welfare Fund office nonetheless provide certain services to Pension Plan members. For example, Local 15 members who visit the Welfare Fund's New York office may obtain copies of the Pension Plan SPD, and may also submit Pension Plan applications for retirement and pension. If a Local 15 member asks questions about Pension Plan benefits, Welfare Fund employees generally direct the member to contact the Pension Fund directly. At their depositions, however,

---

[10] Although the parties' portrayals of the Welfare Plan's operation in this regard coincide, they diverge on the question whether the Welfare Plan SPD describes those procedures with the reasonable clarity to which its members are entitled under the law. *See* Discussion Section III.B.3, below.

some Welfare employees testified that they occasionally helped Local 15 members identify relevant pages in the Pension Plan SPD, or glanced through a member's Pension Plan application to check for completeness before it was submitted. In addition, when a member scheduled a meeting with Welfare Fund employees to discuss retirement, it was not unusual for the Welfare employees to contact the Pension Fund and request a pension benefit estimate on the member's behalf.

## II.     The DeRogatises' interactions with the Funds

Frank was diagnosed with lung cancer in January 2011. He died in September. In the intervening nine months, he and Emily discussed Frank's benefit plans with two Welfare Fund employees in New York City: Patrick Keenan (an office administrator) and Richard Lopez (a claims specialist).[11] Following Frank's death, Emily applied to the Pension Fund for the 100% Joint Annuity benefit that she understood Frank had elected for her, but received instead the (smaller) Preretirement Annuity.

### A.     Interactions with Patrick Keenan

In early March, approximately two months after Frank's diagnosis was made, he and Emily met with Keenan at the Welfare Fund's New York office to discuss Frank's possible retirement. Keenan described Frank's post-retirement options for health benefits under the Welfare Plan and for pension benefits under the Pension Plan, and gave the DeRogatises a copy of the Pension Plan retirement application. Frank told Keenan that he wanted to elect the 100% Joint Annuity benefit.[12]

---

[11] The details of these interactions are disputed. For purposes of this appeal, the Court must take as accurate the account provided by Emily, the non-moving party. *Nick's Garage*, 875 F.3d at 113.

[12] Emily testified in deposition that, after Frank expressed this desire, Keenan "gave him a paper to sign." Pension App'x 2183. Emily presumed that the document recorded Frank's request for the 100% Joint Annuity. The record on appeal does not contain any document from the March

After the meeting, Keenan sent Frank a letter dated March 11, 2017, responding to questions raised at the meeting about "what type of Pension, Welfare and Annuity benefits Emily would be entitled to receive if, *while actively working*, [Frank] passed away" and, in the alternative, "what benefits [Frank] and Emily would be entitled to receive *if [Frank] elected to retire.*" Pension App'x 901–02 (emphases in original). Keenan attached to the letter a copy of the Pension Plan SPD, as well as a pension benefit estimate that he had acquired from the Pension Fund on Frank's behalf. The estimate document showed the benefit payments that Frank and Emily could expect to receive under the Joint Annuity at the various spousal benefit percentage levels, as well as under a single life annuity without a spousal benefit.

With respect to the benefits that Emily would receive if Frank died "while actively working," Keenan's letter directed Frank to consult the Pension Plan SPD provisions that discuss Preretirement Annuities, and stated that, under the Welfare Plan, Emily would be entitled to three years of health coverage following Frank's death. *Id.* at 901 (emphasis omitted). The letter then turned to the benefits that would be available if Frank "elected to retire." *Id.* at 902 (emphasis omitted). It cited to section 8 of the Pension Plan SPD, which defines the options for pension benefits (including the Joint Annuity) and for death and survivor benefits (including the Preretirement Annuity). The letter also referenced the attached estimate document, which it described as listing "the percentage and corresponding dollar amounts for each of the [Joint Annuity] options that the [] Pension Fund provides." *Id.*

---

2011 meeting that bears Frank's signature, however, nor has any party identified a Pension Plan document that would allow members to elect a form of pension benefit before applying for retirement. Thus, while Emily's recollection of Frank signing a paper in Keenan's office might explain her subjective expectation that she would receive the 100% Joint Annuity survivor benefit, the Court does not find it reasonable to infer from her testimony that Frank signed a document effecting his election of that benefit.

As to health benefits, the letter did not address the consequences of *early*

retirement, the only type of retirement for which Frank was eligible. Instead, the letter

stated that if Frank "met the eligibility requirements for *normal* retirement," or if he

retired after receiving a Social Security disability award, the Welfare Plan would

provide Frank and Emily with "active [health] benefits until such time that [the

benefits] would expire." *Id*. at 902 (emphasis added). The letter referred to the

corresponding provisions in the Welfare Plan SPD but offered no further explanation as

to when the DeRogatises' health benefits would expire after Frank's "normal"

retirement.

Emily acknowledges that, when Keenan's letter arrived, she did not read it

closely, and neither she nor Frank reviewed the cited portions of the Pension and

Welfare Plan documents.

B.     Interaction with Richard Lopez

Frank was hospitalized with pneumonia in late July of 2011. While he was in the

hospital, he and Emily completed the Pension Plan application for "early" retirement

and Emily brought it with her to the Welfare Fund office in early August.[13] In the

vestibule of the office, she spoke with Lopez, a Welfare Fund claims specialist, telling

him that Frank had lung cancer and intended to retire, but that she had not yet

---

[13] In its 2015 opinion, the District Court cited the amended complaint for the proposition that Frank "had selected the 100% survivor's benefits option on his pension application." *DeRogatis v. Bd. of Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs.* ("*DeRogatis I*"), No. 13 CIV. 8788, 2015 WL 1923544, at *2 (S.D.N.Y. Apr. 2, 2015). The summary judgment record includes a copy of Frank's signed retirement application, however, and nowhere on the application form do we see any mention of the 100% Joint Annuity or of any other form of pension benefit. *See* Pension App'x 1000–02. We are not aware of any record evidence suggesting that Frank elected a particular form of pension benefit in his retirement application.

submitted the retirement application because she did not have all of the necessary supporting documents.

Lopez advised Emily not to file the application. He explained that if Frank retired before reaching age 62 the following spring, the DeRogatises would lose their health benefits under the Welfare Plan unless Frank had received a Social Security disability award.

Lopez's statement was accurate insofar as a Welfare Plan member who retires stops accruing *additional* months of health coverage under the Plan. That was not how Emily interpreted Lopez's comments, however. Rather, she (reasonably enough) understood him to be saying that Frank would lose his health benefits *immediately* upon taking early retirement. At the time of Emily's visit, however, Frank had already earned future health coverage through April 2012, and as discussed above, he would remain entitled to those additional months of coverage even if he retired in the interim.[14]

Emily was concerned about the cost of Frank's mounting medical bills, and so, on Lopez's advice as she understood it, she decided not to submit Frank's retirement application. Instead, she applied on Frank's behalf for the Welfare Plan's short-term disability benefit, which would provide a limited stream of income while Frank was too sick to work. Emily did not contact the Pension Fund in Washington directly or otherwise seek to confirm what she understood from Lopez about Frank's current eligibility for health, pension, or survivor benefits.

---

[14] Lopez's statement about the DeRogatises' options for post-retirement health coverage was potentially misleading in another respect as well: he did not mention the possibility of extending health coverage for up to 18 months after Frank terminated his employment, as permitted under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §§ 1161–62.

C.      Emily's application for survivor benefits

Frank died in September 2011 without having filed a retirement application with the Pension Fund. Later that month, Emily applied for survivor benefits, expecting to receive the 100% Joint Annuity that Frank had intended for her. As of March 2011, the 100% Joint Annuity benefit was estimated at $1,076 per month. In response to her application, however, the Pension Fund determined that she was entitled only to the Preretirement Annuity, which provided a monthly payment of $787, a difference of almost $300.

To challenge this determination, Emily pursued several rounds of administrative appeal with the Pension Fund, initially proceeding pro se and later with the benefit of counsel. During these appeals, she sent to the Fund the early retirement application that Frank had signed, but that had not been submitted, before his death. At the close of these proceedings, the Pension Fund reaffirmed its conclusion that Emily was not entitled to the 100% Joint Annuity, notwithstanding the posthumously filed retirement application. It continued to pay her the Preretirement Annuity.

## III.     Procedural history

A.      DeRogatis's claims

In December 2013, while her administrative appeals were ongoing, Emily sued the Pension Fund in the Southern District of New York seeking two types of relief: an injunction requiring the Pension Fund to provide her with the 100% Joint Annuity survivor benefit going forward, and monetary compensation for the shortfall in the survivor benefit payments she had already received. She asserted two causes of action under ERISA: first, a claim for benefits due from the Pension Plan under section

17

502(a)(1)(B); and second, a claim for breach of fiduciary duty under section 502(a)(3).[15] The fiduciary breach claim rested on misrepresentations alleged to have been made by Keenan and Lopez in their capacity as apparent agents of the Pension Fund.

The following year, in November 2014, DeRogatis separately sued the Welfare Fund, also in the Southern District of New York. She asserted a single claim against the Welfare Fund under section 502(a)(3), for breach of fiduciary duty based on Lopez's alleged misrepresentations. She sought monetary relief sufficient to compensate her, both retrospectively and prospectively, for the difference between the Preretirement Annuity that she was receiving from the Pension Fund and the 100% Joint Annuity to which she claimed she was entitled.

## B.    The District Court's decisions

The District Court consolidated the two cases in March 2015. Over the following one and one-half years, the District Court issued multiple orders that collectively de-consolidated the two cases and granted summary judgment to all defendants on all claims.[16]

---

[15] In this lawsuit, as in the suit against the Welfare Fund, DeRogatis asserted an additional claim under ERISA § 502(a)(3)(B) for "other appropriate equitable relief." The District Court construed those claims as duplicative of the claims for breach of fiduciary duty, which arise under the same provision of ERISA and which appeared to target the same alleged ERISA violations. On appeal, DeRogatis has not challenged that construction.

[16] *See DeRogatis I*, 2015 WL 1923544 (granting the Pension Fund's motion for summary judgment as to DeRogatis's claim for benefits due, but denying the motion as to her claim for breach of fiduciary duty); *DeRogatis v. Bd. of Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs* ("*DeRogatis II*"), 167 F. Supp. 3d 574 (S.D.N.Y. 2016) (granting summary judgment to the Welfare Fund on the fiduciary breach claim), *reconsid. denied* ("*DeRogatis III*"), No. 13 CIV. 8788, 2016 WL 1319247 (S.D.N.Y. Apr. 1, 2016) (rejecting DeRogatis's additional arguments as to fiduciary breach and de-consolidating the two cases); *DeRogatis v. Bd. of Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emp'rs* ("*DeRogatis IV*"), No. 13 CIV.

18

With respect to DeRogatis's claim against the Pension Fund for benefits due, the District Court found no abuse of discretion in the Fund's determination that, under the terms of the Pension Plan, Emily was entitled only to the Preretirement Annuity benefit, and not the 100% Joint Annuity benefit. As to the claims for breach of fiduciary duty, the court concluded that both Funds were entitled to summary judgment because Keenan and Lopez performed the type of "ministerial" functions that do not give rise to fiduciary duties.[17] The court further concluded that neither Fund was liable under the theory of fiduciary breach articulated in *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5 (2d Cir. 1997), in which we held that a plan administrator may be liable for fiduciary breach based on a combination of unclear summary plan descriptions and misleading statements made by benefits counselors. In the District Court's view, each Fund had issued sufficiently clear plan documents to warrant summary judgment in their favor even under a *Becker* theory. The court entered final judgment in both cases and these appeals followed. We heard the appeals in tandem.

## DISCUSSION

On appeal, DeRogatis challenges the District Court's summary judgment decisions as to each of her three ERISA claims.[18] As noted, we review grants of

8788, 2016 WL 5805283 (S.D.N.Y. Sept. 19, 2016) (granting summary judgment to the Pension Fund on the claim for fiduciary breach).

[17] The District Court identified a genuine dispute of material fact as to whether Keenan and Lopez acted as apparent agents of the Pension Fund in their interactions with the DeRogatises, *DeRogatis I*, 2015 WL 1923544, at *10, but as explained above, the court ultimately granted summary judgment to the Pension Fund on other grounds.

[18] DeRogatis also purports to appeal separately the District Court's denial of her motion to reconsider the grant of summary judgment to the Welfare Fund. DeRogatis's motion for reconsideration merely restated her argument under *Becker*, a theory that she had already articulated—and thus preserved for appeal—in her opposition to the Welfare Fund's motion for summary judgment. *See, e.g., Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 80 n.5 (2d Cir.

19

summary judgment de novo, resolving all ambiguities and drawing all reasonable inferences in favor of the non-moving party. *Nick's Garage*, 875 F.3d at 113. For the reasons set forth below, we affirm the award of summary judgment to the Pension Fund on DeRogatis's claim for benefits due. As for DeRogatis's claims for breach of fiduciary duty, we affirm the grant of summary judgment to the Pension Fund and vacate the grant of summary judgment to the Welfare Fund.

## I.      The summary judgment standard

A party moving for summary judgment bears the burden of "show[ing] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this case, defendants moved for summary judgment on claims for which DeRogatis would have borne the ultimate burden of proof at trial. In such a posture, the moving defendants may "satisfy [their] burden of production under Rule 56" by "negat[ing] an essential element of the [plaintiff's] claim," whether by submitting undisputed evidence to that effect or by demonstrating the insufficiency of the plaintiff's own evidence. *Nick's Garage*, 875 F.3d at 114. By the same token, the moving defendants will be denied summary judgment "if the evidence is such that a reasonable [factfinder] could return a verdict for the [plaintiff]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

2015). We therefore address her *Becker* argument in our de novo review of the District Court's summary judgment decision, rather than under the "abuse of discretion" standard we apply when reviewing denials of motions for reconsideration. *See Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012).

20

## II.     DeRogatis's claim against the Pension Fund for benefits due

Section 502(a)(1)(B) of ERISA authorizes a "participant or beneficiary" to bring a civil action to "recover benefits due to him under the terms of his plan."[19] 29 U.S.C. § 1132(a)(1)(B). DeRogatis invokes this provision to challenge the Pension Fund's decision to award her the Preretirement Annuity survivor benefit instead of the (larger) 100% Joint Annuity benefit. Under the terms of the Pension Plan, she argues, she was entitled to the 100% Joint Annuity based on the application for early retirement that Frank signed, but did not submit, before his death. We conclude that the terms of the Plan support the Pension Fund's decision. We therefore affirm the award of summary judgment to the Pension Fund on this section 502(a)(1)(B) claim.

### A.     Judicial review of benefit denials

Courts interpret ERISA plans "according to federal common law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002). We "review the Plan as a whole, giving terms their plain meanings," and construing any ambiguities "in favor of the plan beneficiary." *Id*. When a plaintiff asserts a claim for benefits due, we review the plan administrator's decision de novo unless "'the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case an arbitrary and capricious standard applies." *Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 51 (2d Cir. 2016) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Even when the plan confers

---

[19] We begin by addressing this claim because, where "adequate relief is available under [§ 502(a)(1)(B)]," there is "no need . . . to also allow equitable relief under § 502(a)(3)," the section under which DeRogatis asserts her claims for breach of fiduciary duty. *Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006); *see also Varity Corp. v. Howe,* 516 U.S. 489, 515 (1996) ("[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief.").

such discretion, we review de novo those cases in which a plan "fail[s] to comply with the Department of Labor's claims-procedure regulation[s]," unless that failure "was inadvertent *and* harmless" with regard to the claim at issue. *Id.* at 58 (emphasis in original).

      B.      <u>The claim for benefits due under the Pension Plan</u>

DeRogatis concedes that the Pension Plan vests the Pension Fund with discretionary authority to interpret and apply the Plan. She argues, still, that her benefits denial should be reviewed de novo because the Pension Fund failed to comply with certain federal regulations when it adjudicated her appeals. We need not assess DeRogatis's assertion of regulatory noncompliance, however, because we conclude that the Pension Fund's benefits determination survives de novo review.

The Pension Fund invoked section 12.01 of the Plan as the basis for its denial of DeRogatis's request for a 100% Joint Annuity. That section, which appears in the Plan under the heading "Death of Employee," provides as relevant here: "The [Preretirement] Annuity payable to a Qualified Spouse, who survives a Participant with a Vested Interest and who dies prior to his Annuity Starting Date, shall be an amount equal to fifty percent (50%) of such Participant's Accrued Benefit on the date of his death." Pension App'x 197. This provision clearly applies in this instance, given that, at the time of Frank's death, he was eligible for early retirement (he had a "Vested Interest"), but had not applied for retirement or begun receiving a pension benefit (he died "prior to his Annuity Starting Date"). The Fund thus acted properly in awarding DeRogatis the Preretirement Annuity, defined under the Plan as the benefit payable to a "Qualified Spouse[] who survives a deceased Participant with a Vested Interest, as provided in Section 12.01." *Id.* at 100.

22

DeRogatis argues, however, that another Plan provision, section 10.03, entitles her to the 100% Joint Annuity based on Frank's signed application for early retirement, which she submitted to the Pension Fund in connection with her administrative appeals after Frank died. Section 10.03, which appears in the Plan under the heading "Payment of Retirement Benefits," instructs that:

> An application for retirement benefit payments must be filed by the Participant for benefit payments to commence. . . . If the application is filed at any time after the first month for which the Participant could have been entitled to such benefits, it will be accepted as an application for benefits as of the earliest date the Participant was entitled to such benefits, up to twelve (12) months immediately preceding the month in which the application is filed.

*Id.* at 180.

On its face, this language appears to permit retroactive applications for retirement benefits even if a Plan member is no longer alive when the application is filed; after all, it makes no mention of death of the "Participant." DeRogatis's argument fails to account, however, for the difference between an application for *retirement status* and an application for the "*retirement benefit payments*" adverted to in section 10.03. A Pension Plan member begins the retirement process by applying for a particular form of retirement, such as "early" or "normal" retirement. Once the Pension Fund confirms that the member is eligible for the retirement status sought, *id.* at 121, the Fund sends the member an estimate of the payment amount the member would receive under each type of pension benefit, including, if applicable, the Joint Annuity at different spousal percentage levels, *id.* at 169–70. The member must then return a form in which he designates the desired pension benefit structure. *Id.* The Pension Fund does not begin making benefit payments until it receives the completed election form. *Id.* at 180.

23

Frank did not apply for retirement before his death, and so the Pension Fund never sent him a final benefit estimate, nor did he complete a benefit election form. Section 10.03 thus does not apply, and Plan section 12.01, relied on by the Pension Fund, controls. After his death, therefore, Frank was not eligible for the 100% Joint Annuity benefit.[20]

In an attempt to defeat this conclusion, DeRogatis points to her 2011 meeting with Keenan, when Frank stated that he wanted Emily to receive the 100% Joint Annuity. She argues that Frank's statement then should excuse the absence of a written benefit election later. Her position has some basic appeal, but we are mindful that—as the Supreme Court has emphasized—section 502(a)(1)(B)'s language "speaks of *enforcing* the terms of the plan, not of *changing* them." *CIGNA Corp. v. Amara*, 563 U.S. 421, 436 (2011) (emphases in original) (internal quotation marks and alterations omitted). DeRogatis has not identified any Pension Plan provision that would permit a member to elect the 100% Joint Annuity by making an oral representation before retirement in lieu of submitting a written benefit election after retirement. Neither the statute nor the Plan envision discretionary amendments to the Plan's terms, whether by plan administrators or reviewing courts. *See id.*; Pension App'x 103 (Pension Plan section 2.03 requires the Pension Fund trustees, in administering the Plan, to "act in a

---

[20] In line with this conclusion, we note further that the Pension Plan SPD states that only *living* members may file applications for retroactive benefits, as discussed below in Discussion Section III.B.2. As "important as [SPDs] are," however, "their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)." *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (emphasis in original). While a "court [may] look outside the plan's written language in deciding what [the plan's] terms are, *i.e.*, what the language means," a court may not use section 502(a)(1)(B) to enforce SPD language that is inconsistent with the plan document. *Id.* at 436. We thus analyze DeRogatis's claim for benefits due by looking to the terms of the Pension Plan itself. Because we conclude that the Plan unambiguously establishes the DeRogatises' eligibility for pension and survivor benefits, we need not look beyond the four corners of the Plan document to the SPD or other material.

uniform manner under like circumstances with respect to all similarly situated Participants").

Taking a different tack, DeRogatis next counters that the Joint Annuity benefit is an ERISA-mandated form of joint and survivor benefit, and that the Pension Fund "cannot condition entitlement to [mandatory benefits] on requiring the participant to make an election." Pension App't Reply Br. 19. What DeRogatis fails to mention, however, is that the ERISA provision on which she relies requires the Pension Fund to offer *both* a joint and survivor annuity benefit (available to a "vested participant who does not die before the annuity starting date") *and* a preretirement annuity benefit (available to the spouse of a "vested participant who dies before the annuity starting date"). ERISA § 205(a).[21]

On de novo review, we therefore conclude that the Pension Fund acted in accordance with the Plan and the statute when it awarded Emily a Preretirement Annuity, the benefit prescribed in Plan section 12.01 for the surviving spouse of a member who dies without having both retired and begun receiving a pension benefit. For these reasons, we affirm the District Court's grant of summary judgment to the Pension Fund on DeRogatis's claim under section 502(a)(1)(B) for benefits due.

III.    **The claims against both funds for breach of fiduciary duty**

Section 502(a)(3) of ERISA authorizes plan participants, beneficiaries, and fiduciaries to initiate a civil action "to enjoin any act or practice which violates any provision of [ERISA] or terms of the plan, or [] to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). This section allows plan beneficiaries to bring individual

---

[21] The Pension Fund is subject to these requirements by virtue of its design as a "defined benefit" plan. ERISA § 205(b)(1).

actions seeking injunctive relief for an asserted breach of fiduciary duty. *See Bell v. Pfizer, Inc.*, 626 F.3d 66, 73 (2d Cir. 2010). Our precedent holds that, to state a claim under section 502(a)(3) for fiduciary breach based on a defendant's alleged failure to provide complete and accurate information about plan benefits, a plaintiff must establish three elements: (1) the defendant was performing a fiduciary function when it engaged in the conduct at issue in the complaint; (2) the defendant breached a fiduciary duty; and (3) the plaintiff is entitled to equitable relief. *See id.* at 73–74; *Amara*, 563 U.S. at 443–45.

DeRogatis asserts that the Pension Fund clothed Keenan and Lopez (Welfare Fund employees) with apparent authority to speak on the Pension Fund's behalf, and that, through their misrepresentations, the Pension Fund breached a fiduciary duty to appropriately advise the DeRogatises about how to obtain their pension and survivor benefits. In similar vein, DeRogatis asserts that the Welfare Fund breached a duty when Lopez misstated the DeRogatises' eligibility for post-retirement health coverage. Each set of misrepresentations, she argues, caused her and her husband to delay submitting Frank's retirement application, thereby inadvertently forfeiting the opportunity to apply for the 100% Joint Annuity benefit. She seeks equitable relief that would make her whole, whether by enjoining the Pension Fund to provide her with the 100% Joint Annuity benefit for her lifetime, or by imposing a surcharge on one or both Plans that would compensate her for the difference between the Preretirement Annuity she is currently receiving and the 100% Joint Annuity that Frank intended her to have.

For the reasons set forth below, we conclude that the District Court erred in holding that neither Fund performed a fiduciary function through Keenan and Lopez when those agents communicated with the DeRogatises about their benefits. We nonetheless affirm the court's award of summary judgment to the Pension Fund,

26

concluding that the Fund fulfilled its fiduciary duty of communication in this instance through its written summary plan description.

With respect to the Welfare Fund, however, we perceive a dispute of material fact bearing on the question of fiduciary breach: that is, whether the Fund's written plan materials, combined with purported misrepresentations by the Fund's employees, failed to adequately inform the DeRogatises about the effect that Frank's early retirement would have on the couple's health benefits under the Welfare Plan. We therefore vacate the award of summary judgment to the Welfare Fund and remand to the District Court for consideration of whether, on the present record, a factfinder could reasonably conclude that DeRogatis is entitled to equitable relief. If not, then the Welfare Fund may be entitled to summary judgment, notwithstanding the dispute of fact as to whether the Fund breached a fiduciary duty.

A.     Fiduciary function

As administrators of their respective plans, the Pension and Welfare Fund trustees act as fiduciaries when they communicate with Plan members and Plan beneficiaries about their benefits. The fiduciary quality of their function continues when they communicate on those key topics through the statements of agents who do not, themselves, meet the definition of a "fiduciary" in their own right. We therefore reject the Funds' contention that they cannot be liable for breach of fiduciary duty based on statements made by non-fiduciary, "ministerial" employees. Accordingly, we conclude that neither Fund demonstrated an entitlement to summary judgment based on the "fiduciary function" element of Emily's claims for breach of fiduciary duty: a factfinder could reasonably conclude that the *Funds* performed a fiduciary function when *speaking through* the Welfare Fund's ministerial employees.

### 1. *Legal standard*

The Supreme Court has established the context for our consideration of such section 502(a)(3) claims as Emily asserts here: "In every case charging breach of ERISA fiduciary duty, . . . the threshold question is . . . whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226 (2000). As relevant for these appeals, ERISA provides that a "person is a fiduciary with respect to a plan to the extent [that] he exercises any discretionary authority or discretionary control respecting management of [the] plan," or "has any discretionary authority or discretionary responsibility in the administration of [the] plan." ERISA § 3(21)(A). Therefore, we determine whether an individual or entity is an ERISA fiduciary "by focusing on the function performed, rather than on the title held." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987).

Shortly after ERISA's enactment in 1974, the Department of Labor ("DOL") issued guidance on several "aspects of fiduciary responsibility" arising under the new statute. 29 C.F.R. § 2509.75-8 (1975). In the guidance document, DOL explained that a plan employee does not act as a fiduciary when "perform[ing] purely ministerial functions . . . within a framework of policies, interpretations, rules, practices and procedures made by other persons . . . because [he] does not have discretionary authority or [] control respecting management of the plan." *Id.* at D-2(A). As examples of ministerial functions, it cited (among other functions) "[a]pplication of rules determining eligibility for participation or benefits" and "orientation of new participants and advising participants of their rights and options under the plan." *Id*. at D-2(Q)(1), (7).

In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), however, the Supreme Court clarified that *plan administrators* act as fiduciaries when they "answer[] beneficiaries' questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits." *Id*. at 502–03. In *Varity*, the Court's specific holding concerned "information [provided] about the likely *future* of plan benefits"—that is, a prediction about whether the plan would continue to exist. *Id.* at 502 (emphasis added). In determining that plan administrators act as fiduciaries when sharing such information, however, the Court observed more generally that ERISA "requires administrators to give beneficiaries certain information about the plan," and that "administrators, as part of their administrative responsibilities, frequently offer beneficiaries more than the minimum information that the statute requires."[22] *Id.* The Court instructed that administrators perform a fiduciary function when they provide information to help "beneficiaries to make [] informed choice[s]" about the plan, whether that information concerns the benefits currently available under the plan, or the ongoing integrity of the plan itself. *Id*.

### 2. *Conduct by Keenan and Lopez on behalf of the Funds*

The District Court awarded summary judgment to both Funds based in part on its conclusion that, in advising the DeRogatises, Welfare Fund employees Keenan and Lopez performed purely ministerial functions, and therefore, that their conduct could not give rise to a breach of fiduciary duty. We agree with the District Court that a non-

---

[22] The Pension and Welfare Funds administer their respective plans, and so clearly fall within *Varity*'s core holding. This Court has since cautioned, however, that *Varity*'s holding does not necessarily apply to other types of ERISA fiduciaries who do not share plan administrators' statutory "responsib[ility] for meeting ERISA's disclosure requirements." *In re Citigroup ERISA Litig.*, 662 F.3d 128, 144 (2d Cir. 2011), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014).

fiduciary plan employee is not personally bound by the fiduciary duties imposed by ERISA, and is therefore not personally subject to liability for fiduciary breach. *See* ERISA § 404; 29 C.F.R. § 2509.75-8. DeRogatis did not name Keenan or Lopez as defendants in either of her lawsuits, however.[23] Rather, she sued each Fund's board and individual trustees.

As administrators of their respective plans, the trustees act as fiduciaries when they communicate with plan members and beneficiaries about plan benefits. *See Varity*, 516 U.S. at 502–03. That fiduciary function encompasses communications conducted by issuing written plan materials like summary plan descriptions, as well as through members' individualized consultations with benefits counselors. *See id*. (noting the fiduciary function of "answering beneficiaries' questions" about plan benefits); *see also, e.g., Bouboulis v. Transp. Workers Union*, 442 F.3d 55, 58, 66 (2d Cir. 2006) (concluding that a union, when acting as a fiduciary, may be liable for intentional misrepresentations about benefits that were made to members by union "officers [and] staff"). Thus, the Funds may perform a fiduciary function through ministerial agents without converting those individual agents themselves into fiduciaries.

---

[23] This difference in posture distinguishes the present appeal from *Tocker v. Kraft Foods North America, Incorporated Retirement Plan*, 494 F. App'x 129 (2d Cir. 2012), a non-precedential summary order in which this Court concluded that a human resources employee, Robert Varone, acted in a ministerial capacity "when he researched and communicated to [plaintiff] the benefits [plaintiff] would receive" under the company's retirement plan. *Id*. at 130. The District Court cited *Tocker* as "the Second Circuit's most on-point application of ERISA's definition of a fiduciary to plan employees." *DeRogatis II*, 167 F. Supp. 3d at 579. In *Tocker*, however, Varone was named as a defendant. The "only issue" decided in *Tocker* was whether Varone *himself* "acted in a fiduciary capacity." 494 F. App'x at 130. The *Tocker* panel did not address the question presented in this appeal: whether the conduct of a plan employee might contribute to a finding that the plan's *administrator* breached a fiduciary duty.

As we have described, Keenan and Lopez were Welfare Fund employees, and it is undisputed that they acted within the scope of their employment when they communicated with members of Local 15 about health benefits. In addition, as we will explain, we may assume without deciding that the District Court correctly discerned a dispute of material fact as to whether Keenan and Lopez acted with apparent authority as agents of the *Pension* Fund, as well as of the Welfare Fund. Thus, for purposes of this appeal, we treat Keenan and Lopez as agents of the *Welfare* Fund when they advised the DeRogatises regarding health benefits, and as agents of the *Pension* Fund when they offered advice regarding pension benefits: we may presume that those communicative activities constituted fiduciary conduct attributable to each set of plan administrators.

A.      Breach of a fiduciary duty

Having determined that the Pension and Welfare Funds performed a fiduciary function when they communicated with the DeRogatises about plan benefits, the Court must next consider whether the District Court could reasonably conclude that either Fund breached a fiduciary duty in carrying out that obligation.

In *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5 (2d Cir. 1997), we held that a fiduciary may be liable for fiduciary breach if a plan member is misled due to a combination of an unclear summary plan description and misrepresentations by the fiduciary's agents. *Id.* at 10. Here, we agree with the District Court's conclusion that the Pension Plan SPD clearly communicates the eligibility requirements for pension and survivor benefits, thereby precluding liability under *Becker*. Because the Pension Fund has negated the "fiduciary breach" element of DeRogatis's section 502(a)(3) claim, we affirm the grant of summary judgment to the Pension Fund. As to the Welfare Fund, however, we conclude that under *Becker*, DeRogatis may be able to show a breach a fiduciary duty. The Welfare Fund is thus not entitled to summary judgment based on

31

this element of DeRogatis's claim, and we must vacate and remand the District Court's judgment in this regard.[24]

### 1. Legal standard

#### a. The fiduciary duties imposed by ERISA

Section 404 of ERISA defines multiple fiduciary duties, two of which are relevant for these appeals. The first is the duty of *loyalty*, which requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and [] for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1)(A). The second is the duty of *prudence*, which requires fiduciaries to "discharge [their] duties . . . with the care, skill, prudence, and diligence under the circumstances . . . that a prudent [person] acting in a like capacity and familiar with such matters would use." *Id*. § 404(a)(1)(B).

The statute "does not . . . elaborate in any detail on the duties owed by a fiduciary" beyond the text just quoted, and so "courts have . . . been called upon to define the scope of a fiduciary's responsibilities." *Becker*, 120 F.3d at 8 (internal quotation marks omitted). To assist in that endeavor, the Supreme Court has explained that "these fiduciary duties draw much of their content from the common law of trusts," *Varity*, 516 U.S. at 496, subject to the caveat that "trust law does not tell the entire story," *id*. at 497. Courts must be mindful to preserve ERISA's "careful balanc[e]" between the interests of "ensuring fair and prompt enforcement of rights under a plan

---

[24] On remand, the Welfare Fund may be able to establish its entitlement to summary judgment based on the final element of DeRogatis's claim of fiduciary breach, the availability of equitable relief. We briefly discuss this element—and our reasons for declining to adjudicate it in this appeal—in Discussion Section III.C, below.

and the encouragement of the creation of such plans." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal quotation marks omitted).

b.    Fiduciary breach based on misrepresentations

We have long recognized that fiduciaries breach their duty of loyalty if they "knowingly or intentionally mislead plan beneficiaries as to changes—whether effective or under consideration—to employee benefit plans." *Bell*, 626 F.3d at 74; *see also Varity*, 516 U.S. 489. In that context, we have endorsed theories of liability that rest on material omissions as well as affirmative misstatements. *See, e.g., Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 88 (2d Cir. 2001) ("When a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." (alteration omitted)). *But see Varity*, 516 U.S. at 506 (declining to "reach the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries").

DeRogatis has not accused either plan of intentionally misleading her or her husband about their benefits. To establish a breach of fiduciary duty based on *un*intentional misrepresentations, DeRogatis must satisfy the more restrictive standard that we recognized in *Estate of Becker*: Fiduciaries have a duty to "provide [participants] with complete and accurate information" about plan benefits,[25] and they breach that

---

[25] *Becker* did not expressly link this fiduciary duty to any of the duties defined in the ERISA statute. Communicating about plan benefits is a fiduciary function, as explained above in Discussion Section III.A.1. While the duty of loyalty prohibits a fiduciary from *intentionally* misleading a plan member or beneficiary, the duty of prudence imposes a different kind of guardrail: when communicating about benefits, fiduciaries must act "with [] care, skill, prudence, and diligence." ERISA § 404(a)(1)(B). In other words, they must "provide . . . complete and accurate information." *Becker*, 120 F.3d at 10.

duty if their agent inadvertently misleads participants about a benefits question on which the summary plan description, too, is unclear. 120 F.3d at 10. This understanding of liability builds on plan administrators' statutory obligation to distribute an SPD that is "written in a manner calculated to be understood by the average plan participant," and that is "sufficiently accurate and comprehensive to reasonably apprise [] participants and beneficiaries of their rights and obligations under the plan." ERISA § 102(a).

Under the pension plan at issue in *Becker*, an employee seeking to retire had to submit a retirement application form and comply with various other "necessary formalities" to qualify for payments. 120 F.3d at 9. The defendant company would not issue any such payments, however, unless the employee "survived until the 'effective date' of retirement," which it construed as "the first day of the month after an employee's election to retire." *Id.* (emphasis omitted).

On a putative recipient's challenge to this approach, the *Becker* panel found it "questionable whether the SPD clearly alert[ed] participants to the fact that an employee who elects to retire but dies before the first day of the next month loses her vested retirement benefits." *Id*. That precise circumstance befell the unsuspecting Carol Becker, who was terminally ill, but who delayed in filing her retirement papers after a benefits counselor assured her that she could "take [her] retirement any time [she felt] like it." *Id*. at 6. The panel declined to decide "whether the SPD was, by itself, so ambiguous and incomplete as to violate [ERISA]"; for purposes of determining liability, it was sufficient that the benefits counselor "exacerbated the lack of clarity inherent in the SPD and thereby provided Becker with materially misleading information." *Id.* at 10. "Taking these circumstances together," the panel concluded, the employer

"breached its fiduciary duty to provide Becker with complete and accurate information about her retirement options."[26] *Id*.

### 2. *The Pension Fund*

Emily asserts here that the Pension Fund breached its fiduciary duty by failing to appropriately advise her and Frank that, if Frank did not retire before his death, he would forfeit his right to the 100% Joint Annuity survivor benefit. We agree with the District Court's conclusion, however, that the Pension Plan SPD contained all the information necessary for the couple to ascertain their rights regarding pension and survivor benefits. Under *Becker*, that conclusion is decisive as to the Pension Fund's liability.

Under the boldfaced heading "How Your Pension, Disability Or Survivor Benefit is Paid," section 8 of the SPD describes the Joint Annuity (available to a plan member who is married on the date of retirement) and the Preretirement Annuity (awarded to the surviving spouse of a member who "die[s] before the commencement of retirement benefits"). Pension App'x 1805–06. A few pages later, under the boldfaced heading "Benefits Payable in the Event of Your Death," section 9 of the SPD repeats the message that the Preretirement Annuity is *the* benefit provided to the surviving spouse of a member who "had a right to an early retirement benefit," but who "had not yet applied" at the time of death. *Id*. at 1809 (para. 4). In addition, the SPD expressly prohibits posthumous applications for retirement benefits by instructing members as

---

[26] We note that *Becker* involved a claim of fiduciary breach based on misrepresentations to a plan member, while Emily's claims rely in part on alleged misrepresentations that Lopez made to her when Frank—the plan member—was not present. Emily received health benefits through Frank's membership in the Welfare Fund, however, and the fiduciary duties of loyalty and prudence run to both members *and* beneficiaries, *see* ERISA § 404(a)(1). Defendants have not argued that *Becker*'s holding does not apply to misrepresentations made to plan beneficiaries, and we see no reason that its rule should be limited to one class or the other.

follows: "In the event you delay in applying for pension benefits, you will receive retroactive payments to your date of eligibility, . . . *provided you are still alive as of the date the application is received.*" *Id.* at 1815 (emphasis added). In contrast, it advises that "if you were receiving a normal, special, or early retirement benefit," then "[a] death benefit will be paid under the rules for the type of monthly benefit you elected at the date of your retirement," and refers the reader to section 8 "[f]or details." *Id.* at 1809 (para. 1).

We conclude that, unlike the SPD at issue in *Becker*, the Pension Plan SPD "clearly alerts" plan members to the conditions under which their spouses qualify for pension and survivor benefits, including the 100% Joint Annuity that Emily hoped for and the Preretirement Annuity that she ultimately received. *Becker*, 120 F.3d at 9. Thus, even if Keenan and Lopez did act as the Pension Fund's agents when they discussed Frank's retirement options with one or both of the DeRogatises, and even if Keenan or Lopez did unintentionally misstate the eligibility requirements for pension and survivor benefits, the Pension Plan SPD is sufficiently clear to preclude the Pension Fund from being found culpable for fiduciary breach under a *Becker* theory.[27]

---

[27] At least one circuit has suggested that an ERISA fiduciary may breach a duty because of unintentional misrepresentations even when the SPD is clear if there is no evidence that the plaintiff knew or should have known of the applicable SPD provisions at the time of the relevant conduct. *See Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 550 (6th Cir. 1999) ("Providing a summary plan description [four] years before the request for information does not excuse [the fiduciary] from its duty to respond fully and accurately to later inquiries regarding benefits."). We need not consider any such qualification of *Becker* because, even under a modified theory, DeRogatis would be unable to show a fiduciary breach. In March 2011, six months before Frank's death, Keenan sent the DeRogatises a copy of the Pension Plan SPD and specifically cited to the relevant sections on pension and survivor benefits. *See* Background Section II.A, above; *cf. Krohn*, 173 F.3d at 550 ("[I]t would have been preferable for [the fiduciary] to refer the plaintiff to her [SPD] . . . , and to have given her an additional copy if she had lost her own, than to have" answered her questions through a personnel assistant "in such a careless and incomplete manner.").

We therefore affirm the District Court's grant of summary judgment to the Pension Fund on this section 502(a)(3) claim.

### 3. *The Welfare Fund*

Emily asserts that, applying *Becker* principles, the Welfare Fund should be found to have breached its fiduciary duty to her because neither its Plan documents nor its agents clearly explained how Frank's retirement would affect the DeRogatises' entitlement to health coverage. We conclude that, drawing all reasonable inferences in her favor, the current record supports that assertion. The Welfare Fund has thus failed to negate the "breach of duty" element of DeRogatis's section 502(a)(3) claim, and further proceedings are necessary.

### a. The Welfare Plan SPD

The Welfare Plan SPD runs 156 pages in length and contains neither a table of contents nor an index. After a brief introduction, the SPD delivers the bulk of its substantive provisions in a series of alphabetized sections covering topics ranging from the highly specific to the most generic. (Under the letter E, for example, members can find information about "Epidural Steroid Injections/Nerve Blockers," followed by a section that sweepingly addresses "Exclusions, Exceptions and Plan Limitations." *See* Welfare App'x 678.) The SPD does not contain an alphabetized section named "retirement" or a relevant cross-reference for persons seeking information about health benefits post-retirement. After the alphabetized sections, the SPD introduces two other sections discussing benefits for retired Plan members (whom it refers to as "Pension Members"). The SPD concludes with two sections containing general guidance for Plan

members, which contain the following directives: "Read this book in its entirety," and "When in doubt ...... ASK!"[28] *Id*. at 766–67.

One of the non-alphabetized sections toward the end of the SPD is called "Benefits and Provisions For Pension Members And their Eligible Dependents who are not eligible for Medicare Benefits." *Id.* at 731. In that section, the SPD states that health benefits for retirees "who are age 62 . . . are generally the same as for active members," and directs readers to consult the alphabetized "Eligibility" section. *Id*. This end-of-SPD section (regarding "Benefits and Provisions . . .") makes no mention of those "early" retirees who have not reached the age of 62, and therefore fails entirely to advise a member in Frank's position about how early retirement would affect his and his spouse's health benefits.

The cited "Eligibility" section further contributes to the SPD's opacity on this question. This section is divided into subsections specific to various local unions within the International Union of Operating Engineers. Those subsections are further divided into sub-subsections that define the eligibility rules for the occupants of different roles within each union (e.g., "Owner Operators" in Local 15D). The relevant section for

---

[28] Its length and structure alone raise a serious question about whether the Welfare Plan SPD fails to satisfy ERISA's mandate that plan fiduciaries circulate a summary plan description "written in a manner calculated to be understood by the average plan participant." ERISA § 102(a); *see Becker*, 120 F.3d at 8 ("In assessing the adequacy of an SPD, we consider the document as a whole."); *Amara*, 563 U.S. at 437–38 (contrasting the "simplicity and comprehensibility" of an optimal SPD with the "qualifications and nuances" that may be necessary in the full plan description); *see also, e.g.*, *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 721 (8th Cir. 2014) (finding a breach of fiduciary duty where the administrator failed to issue an SPD and instead disseminated a plan description that was "nearly 100 pages long" and that "contain[ed] technical language unlikely to be read or understood by 'the average plan participant'"). We need not decide this question, however, in light of our conclusion that the SPD, taken together with representations made by the Welfare Fund's agents, failed to convey "complete and accurate information" as required by *Becker*, 120 F.3d at 10.

Frank, a non-owner member of Local 15, describes the system by which non-retired members earn entitlement to future health coverage, as we have outlined above in Background Section I.B. In describing that system, however, the SPD occasionally uses the term "benefit periods" to refer to *both* the four-month periods during which participants *accrue* future coverage (also referred to as "redemption periods"), as well as the ensuing periods of four to twelve months during which participants *receive* coverage (also referred to as "coverage periods").[29] *See id.* at 662–64.

Then, five pages after the "Local 15" subsection, under the heading "Eligibility requirements for members who elect early retirement," the SPD provides almost impenetrably as follows: "If you elect for early retirement your coverage will cease with this Plan upon the normal cessation of the benefit period you are covered through at the time of early retirement approval from the [] Pension Fund." *Id*. at 669. Because the SPD has suggested two mutually exclusive definitions for the operative term "benefit period," a diligent member consulting the SPD might understandably remain unsure about when his health coverage will cease after he takes "early" retirement.[30]

Moreover, a member of Local 15 might not realize that this provision applies to him *at all*. The section dedicated to Local 15 does not direct members to read on for information about retirement. After the SPD discusses each union (ending with Local 15D), it introduces the discussion of early retirement using a small-font subheading—the same type of subheading used to introduce the various roles within

---

[29] The SPD contains a "definitions" section, but the terms "benefit period," "redemption period," and "coverage period" are not defined in that section.

[30] In addition, in a puzzling lapse, this section does not even mention the possibility of extending coverage under COBRA, a statutorily required option discussed above at note 14. Rather, the Plan's section on COBRA is located under the letter C, a full 25 pages away from the section addressing early retirement under the heading of "Eligibility."

each union. With no large-font heading announcing policies of general applicability, a skimming reader might reasonably (but incorrectly) assume that the "Local 15" section is self-contained, and that all the small-font subheadings that appear under "Local 15D" apply only to that local union, and not to the others.

For these reasons, we disagree with the District Court's conclusion that the Welfare Plan SPD clearly explained all the information the DeRogatises needed to understand their options for health benefits after Frank's retirement. After considering the SPD's structure, formatting, and substance, as described above, we find it at least "questionable" whether the SPD "clearly alerts participants" to the consequences of early retirement for their health benefits. *Becker*, 120 F.3d at 9.

We emphasize, moreover, that retirement is not a "remote or idiosyncratic contingency," but rather an expected—indeed, anticipated—milestone for many union members. *Id.*; *see also* ERISA § 102(b) (providing that SPDs must inform members about "the plan's requirements respecting eligibility for participation and benefits," as well as the "circumstances which may result in . . . ineligibility, or denial or loss of benefits"). It is, therefore, eminently reasonable for members to expect the SPD to address that scenario.

> b. The Welfare Fund's communications with the DeRogatises

The next step in determining whether the Welfare Fund breached a fiduciary duty requires us to consider whether the Fund's various communications with the DeRogatises "exacerbated the lack of clarity inherent in the SPD and thereby provided [the DeRogatises] with materially misleading information." *Becker*, 120 F.3d at 10.

Again, drawing all reasonable inferences in Emily's favor, we conclude that this issue presents a genuine dispute of material fact.[31]

Keenan's March 2011 letter purported to explain the benefits that the DeRogatises "would be entitled to receive if [Frank] elected to retire," but spoke only to a scenario in which Frank "met the eligibility requirements for *normal* retirement." Welfare App'x 230 (emphasis added, other emphases omitted). Keenan's letter did not discuss the effects of *early* retirement—the only retirement option that was available to Frank at the time of his death. Moreover, Keenan's letter stated, somewhat tautologically, that Frank's health benefits would continue after (normal) retirement "until such time that they would expire," *id.*, and cited to the Welfare SPD pages discussed above. The letter thus did not mitigate the plan's imprecise use of the term "benefit period." As for Lopez, Emily understood him to be suggesting, inaccurately, that the DeRogatises' health benefits would expire *immediately* upon Frank's retirement. She testified, moreover, that he expressly advised her to delay filing Frank's retirement application.

The Welfare Fund defendants parry that, in April 2011, Frank received a check stub with a benefits summary stating that his health coverage "extended thru" April 2012. *Id.* at 258. That check stub, the Fund argues, effectively notified Emily of the duration of Frank's future coverage. We are unpersuaded by the Welfare Fund's argument. The check stub's pronouncement did nothing to cure the inconsistencies and

---

[31] Because the District Court found the Welfare Plan SPD sufficiently clear to foreclose liability under *Becker*, the court did not consider whether the Welfare Fund's agents made misrepresentations when communicating with the DeRogatises. Given the amply developed record, we see no need to remand on this narrow question.

omissions contained in the SPD or the inaccuracies in Lopez's advice concerning the effect of retirement on previously credited healthcare coverage.

Looking at the various ways in which the Welfare Fund communicated with the DeRogatises in the months preceding Frank's death, we see a genuine dispute of material fact bearing on whether the Fund breached its fiduciary duty to provide the couple with "complete and accurate information" about their benefits, taking into account (1) the murky SPD, (2) the letter from Keenan, and (3) Lopez's statements. *Becker*, 120 F.3d at 10. We thus conclude that the Welfare Fund is not entitled to summary judgment based on this element of DeRogatis's claim under section 502(a)(3).

B.     Appropriate equitable relief

Although we conclude that the Welfare Fund is not entitled to summary judgment based on either of the first two elements of DeRogatis's section 502(a)(3) claim (fiduciary function and fiduciary breach), the Fund may yet be able to negate the third element: the availability of appropriate equitable relief. The District Court did not reach this third element in light of its decision to award summary judgment to the Fund on other grounds. In this section, we briefly review the standard governing equitable relief under section 502(a)(3) to help frame the District Court's analysis on remand of the question whether, based on the present record, DeRogatis may be entitled to some form of appropriate equitable relief.

1. *Legal standard*

Section 502(a)(3) authorizes courts to remedy a breach of fiduciary duty by "enjoin[ing] any act or practice which violates [ERISA] or the terms of the plan," or by ordering "other appropriate equitable relief." 29 U.S.C. § 1132(a)(3). The Supreme Court has interpreted this provision as making available "those categories of relief that . . . were typically available in equity." *Amara*, 563 U.S. at 439 (internal quotation marks and

42

emphasis omitted). In addition to injunctions, plaintiffs asserting a claim under section 502(a)(3) may seek remedies such as estoppel, equitable reformation of plan terms, or a monetary "surcharge" to recompense "a loss resulting from a [fiduciary's] breach of duty, or to prevent the [fiduciary's] unjust enrichment." *Id*. at 440–42. The showing required of a plaintiff proceeding under section 502(a)(3) thus depends in part on the particular form of equitable relief sought. *See id*. at 443–44 (noting that "detrimental reliance" is a required element for estoppel, but not for reformation or surcharge). If the plaintiff is not entitled to *any* form of equitable relief, however, then the plaintiff has failed to state a claim under section 502(a)(3).

### 2. *Relief*

Emily asserts that, but for the Welfare Fund's fiduciary breach, Frank would have timely retired and applied for (and received) the 100% Joint Annuity. The 100% Joint Annuity is a benefit defined under the *Pension Plan*, however, not the Welfare Plan. Even if Emily successfully proved that the Welfare Fund breached a fiduciary duty, the District Court could not enjoin the Welfare Fund to enroll her in a survivor benefit over which that Fund has no control. Even so, DeRogatis might be entitled to an equitable surcharge remedy that would compensate her for the difference between the 100% Joint Annuity and the Preretirement Annuity, both retrospectively and on an ongoing basis. *See Amara*, 563 U.S. at 441–42.

The District Court did not determine what equitable relief, if any, might be available against the Welfare Fund, nor did the parties brief the issue on appeal. On remand, the District Court should consider whether Emily will be entitled to a surcharge or some other form of "appropriate equitable relief" under ERISA section 502(a)(3) if she successfully proves that the Welfare Fund breached a fiduciary duty.

**CONCLUSION**

For the reasons set forth above, we **AFFIRM** the judgment of the District Court in favor of the Pension Fund in the case designated No. 16-3549, and we **VACATE** the District Court's judgment in favor of the Welfare Fund in the case designated No. 16-977 and **REMAND** that cause for further proceedings consistent with this opinion.